NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

IN RE TERMINATION OF PARENTAL RIGHTS AS TO A.F.

No. 1 CA-JV 23-0128
FILED 2-27-2024

Appeal from the Superior Court in Coconino County
No. S0300SV202200020
The Honorable Angela R. Kircher, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Walneck Law, Scottsdale
By Edward J. Walneck
*Counsel for Appellant Mother*

Davis Miles McGuire Gardner, PLLC, Mesa
By Melissa F. Benson
*Counsel for Appellee Father*

---

**MEMORANDUM DECISION**

---

Presiding Judge Daniel J. Kiley delivered the decision of the Court, in which Judge Kent E. Cattani and Judge D. Steven Williams joined.

---

**K I L E Y**, Judge:

**¶1**　　　　Anne D. ("Mother") appeals the juvenile court's order denying her petition to terminate the parental rights of Mark F. ("Father") to their child, A.F. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

**¶2**　　　　Mother and Father, who married in 2010 and divorced six years later, are the biological parents of A.F., born in 2013. The decree that dissolved their marriage awarded Mother sole legal decision-making authority for A.F. based on the superior court's determination that Father committed acts of domestic violence against Mother during the marriage. *See* A.R.S. § 25-403.03. The decree designated Mother as the child's primary residential parent, with Father having parenting time on alternate weekends and certain holidays.

**¶3**　　　　Viewed in the requisite "light most favorable to sustaining the juvenile court's order," *In re O.M.*, 254 Ariz. 543, 544, ¶ 3 (App. 2023), the evidence shows that in 2017 A.F. began having behavioral "difficulties," throwing "a lot of temper tantrums," and exhibiting "out of control, aggressive, and defiant behavior." Concerned, Mother took A.F. to see therapist Deanna Vance, who diagnosed A.F. with "adjustment disorder with anxiety" and began seeing her regularly. Ms. Vance later testified that the onset of A.F.'s "dysregulation" coincided with Father moving out of town, explaining that A.F. found "being away from [Mother]" while visiting Father "out of . . . the city where [Mother] lives" to be "really scary" and "overwhelming."

**¶4**　　　　In 2018, Mother began living with her boyfriend C.C. Shortly thereafter, A.F. told Ms. Vance that she "didn't like" visiting Father but couldn't explain why. A few sessions later, A.F. stated that she was "angry" with Father for being "mean" and telling her not to hug C.C. She also expressed fear that when Father married his girlfriend she would "have a new mother" and would "never see" Mother again. Meanwhile, A.F.

continued to struggle with "disciplinary issues" at school. At times, she had to be removed from the classroom for "her personal safety or the safety of others" because she was "hitting," "kicking," and "throwing items."

¶5            One weekend in early 2019, A.F. began "throwing a fit" while riding in the car with Father. In response, Father pulled the car over and said something to the effect of: "[D]o you want me to leave you on the side of the street for somebody to come get you?" During a subsequent therapy session, A.F. expressed great distress about Father's threat to force her out of the car and drive away. Father expressed regret for his statement, telling Ms. Vance that he lost his temper because A.F. was demanding "to go back" to Mother's home. Ms. Vance's treatment notes reflect that although Father "apologized" to A.F., she continued to mention Father's statement in subsequent sessions, complaining that his statement shows that Father "doesn't even care" about her.

¶6            One morning in 2019, while A.F. was in a school administrator's office, A.F. stated, "[out] of the blue," that Father "punched" her. The administrator, Jennifer Ernst, later testified that she "didn't ask" A.F. any follow-up questions at the time and instead "just let it be." Later that day, however, Ms. Ernst reported A.F.'s statement to the Department of Child Safety ("DCS").

¶7            A.F.'s report that Father "punched" her led Mother to seek and obtain a temporary order requiring that Father's parenting time be supervised. After that, Father's parenting time was supervised by his father ("Grandfather") and Grandfather's girlfriend N.B. N.B. later testified that A.F. often had "extreme upsets" at parenting time exchanges during which she bit, kicked, screamed "no," and tried to throw things. Once A.F. calmed down, however, she seemed to enjoy her time with Father. Photographs taken during this period, for example, show Father and A.F. playing in the snow and cuddling together.

¶8            In March 2019, DCS determined that A.F.'s allegation that Father "punched" her was unsubstantiated.

¶9            The superior court scheduled a hearing in May 2019 to address Father's parenting time. On May 5, 2019, one week before the hearing date, A.F. arrived at the parenting time exchange "very distraught and angry." Mother had to carry A.F. from the car, and she kicked both parents while "thrashing" and "screaming." After Mother left, A.F. continued acting out, "trying to kick" Father. At one point, she bit Father's arm, breaking the skin; she also pinched N.B., leaving a bruise. After A.F.

3

calmed down, she told Father that she was upset because Mother told her that Father was "going to court" to try to take her away from Mother.

¶10 On the drive home that evening, A.F. told Mother, "[D]ad bit me on my shoulder," adding that "she bit him, and he bit her back." At home, she showed Mother and C.C. a bite mark on her shoulder. Mother took A.F. to see a pediatrician, who contacted DCS after determining that the mark was an "adult human bite mark." During a Safe Child Interview at the Flagstaff Police Department a week later, A.F. reiterated that she "bit [Father's] arm and so he bit the back of her shoulder." When asked why she bit Father, A.F. responded that she didn't want to see him. When asked why she didn't want to see him, A.F. replied, "[B]ecause they broke up."

¶11 Mother moved to suspend Father's parenting time. After a hearing, the court issued a temporary order (the "2019 Order") prohibiting Father "from having face to face or phone or video contact with [A.F.]" and ordering a family evaluation.

¶12 In June 2019, DCS substantiated A.F.'s allegation that Father bit her. Additionally, Father was indicted on one count of child abuse, a class 4 felony, and entered a deferred prosecution program.[1] He has consistently denied biting A.F., however, and testified that he agreed to deferred prosecution "to keep [A.F.] from having to go to court."

¶13 Meanwhile, pursuant to A.R.S. § 25-406, the superior court appointed investigator Sidney Buckman to conduct a family evaluation. As part of his evaluation, Mr. Buckman interviewed both parents, observed A.F. with each of them, and reviewed the DCS records. Noting that Father admitted that he "once had a very explosive temper" (though he claimed to have "learned methods to calm himself"), Mr. Buckman concluded that it is "likely" A.F. has "been uncomfortable and felt unsafe being with Father for quite some time." Mr. Buckman also found, however, that A.F. did not seem fearful of Father during an hour-long observation session. On the contrary, he reported, A.F. sat in Father's lap for 45 minutes, played blocks with him, and "looked happy." Mr. Buckman concluded that "it would be helpful" if Father "gained more insight into his parenting skills and how they affect [A.F.'s] well-being," stating that "Father biting [A.F.] because she bit him indicates he has difficulty channeling his anger in a constructive manner." He recommended that Father attend parenting classes and weekly counseling and that both parents seek education about coparenting.

---

[1] Father's prosecution was reinstated after he allegedly violated the terms of his deferred prosecution agreement in an incident unrelated to A.F.

He further recommended that Father have regular parenting time supervised by a qualified mental health professional and, "when supervised parenting time is about to end," Father and A.F. begin "therapeutic intervention counseling sessions."

¶14 Consistent with Mr. Buckman's recommendations, since 2019, Father has participated in 110 sessions with therapist Dana Peterson and completed several parenting courses.

¶15 Following the 2019 Order's suspension of his parenting time, Father attempted to maintain contact with A.F. by sending cards and gifts. In April 2020, he sent A.F. a "large box of presents and candies with a card in it" for her birthday. C.C. later testified that the gift made A.F. "angry." C.C. stated that, at A.F.'s request, he built a fire in the backyard so she could burn Father's gift.

¶16 In accordance with the family evaluation's recommendation, Father filed a motion requesting reunification therapy with A.F. Mother opposed Father's motion, which the court granted after an evidentiary hearing. The court appointed Ann Claw as the parties' reunification therapist.

¶17 Initially, Father and Mother met with Ms. Claw both individually and together, and A.F. met with Ms. Claw "three or four" times on her own. Finally, Ms. Claw held a session with Father and A.F. together. From Father's perspective, the session "went really well" and felt like a "really nice start." He added that A.F. "didn't talk too much" at first but "started to warm up" after he showed her photos of the pet fish he keeps for her at his home. In a subsequent therapy session with Ms. Vance, however, A.F. expressed "mixed" and "confused" feelings about the session. According to Ms. Vance, A.F. first stated that the meeting was "good" and that Father "seemed different" but then said that she was "mad at [Father] for not listening to her" and didn't want to visit him until she was "in college." Later in the session, A.F. told Ms. Vance that she didn't want to "disappoint" either Mother or Father and "just want[ed] to be dead."

¶18 Mother told Ms. Claw that A.F. had a "meltdown" after seeing Father and, when Ms. Claw met with A.F. individually several weeks later, A.F. "was clear that she would not do another session" with him. Accordingly, Ms. Claw recommended that they "give [A.F.] a break and work on the issues between [Father] and [Mother]." Mother and Father then met with Ms. Claw for three more coparenting sessions. During the

third session, which took place over Zoom, Mother asked Father whether he "would honor" A.F.'s request if she told him that she "did not want to see him" anymore. In response, Father "rais[ed] his voice" and "kept escalating with verbal aggression," so Ms. Claw ended the session.

**¶19**　　　　Shortly after the failed reunification attempt, Ms. Vance diagnosed A.F. with post-traumatic stress disorder ("PTSD"), and A.F. began seeing psychologist Dr. Sherri Gallagher.

**¶20**　　　　Father has not had parenting time with A.F. since the alleged "biting" incident on May 5, 2019. Although a hearing to address parenting time issues was scheduled for April 2022, the hearing was vacated after Mother petitioned to terminate Father's parental rights on grounds of abuse under A.R.S. § 8-533(B)(2). In her petition, Mother alleged that termination was appropriate because Father "willfully abused" A.F. by biting her on May 5, 2019, causing the child to suffer both "physical injury" and PTSD. Mother further alleged that A.F.'s "therapists have agreed that it is not in [A.F.'s] best interests to spend time with [Father]."

**¶21**　　　　At the initial termination hearing in May 2022, the juvenile court appointed counsel for A.F. Father later asked the court to order a social study pursuant to A.R.S. § 8-536. Although A.F.'s counsel agreed that a social study would "likely be useful," Mother objected, insisting that subjecting A.F. to a social study "could trigger" her PTSD and "require her to relive abuses that she sustained." The court overruled Mother's objection and appointed Tracy Anderson to conduct a social study.

**¶22**　　　　After conducting her evaluation, Ms. Anderson submitted a detailed thirteen-page report in which she concluded that terminating the parent-child relationship between Father and A.F. was not in A.F.'s best interests. Ms. Anderson opined that, although Father "has had anger issues," he has "actively participat[ed] in counseling" and "has followed each recommendation given by professionals involved in this case." Accepting the "biting" allegation as true, Ms. Anderson expressed the view that,

> [w]hile any type of abuse of a child is serious, this incident with the bite mark would not be[,] in this investigator's opinion, serious abuse. It is not ongoing, was an isolated incident, and [Father] reached out for counseling and has continued to attend counseling since that incident. . . . He has completed parenting class as well. His therapist of 3 years states that he is making "[a]mazing progress."

¶23  Mother and C.C. married in August 2022, shortly before the termination trial began. C.C. later testified that they married because he wants to adopt A.F. and "the law in Arizona says [they must] . . . be married for a year" before he can do so. Despite his professed desire to adopt A.F., C.C. admitted that "there was no conversation regarding adoption" until after Mother filed her termination petition.

¶24  Between September 2022 and March 2023, the juvenile court conducted a ten-day trial. The trial witnesses included Mother, Father, C.C., several other family members, a police detective, and several of the mental health professionals that have participated in the case. In her testimony, Mother stated, among other things, that when she picked A.F. up after visiting Father on May 5, 2019, A.F. reported that Father bit her. She testified that she took a picture of the bite mark, which was admitted as an exhibit. She further testified that Father has a history of excessive drinking and violent outbursts, that A.F. has reported physical and verbal abuse by Father, and that A.F.'s behavior has improved since she stopped having contact with Father. According to Mother, A.F. would "dramatically benefit" from the termination of Father's parental rights.

¶25  For his part, Father emphatically denied that he ever bit A.F. His testimony on this point was corroborated by N.B., who testified that she supervised Father's parenting time on May 5, 2019 and never saw him bite A.F. Father also accused Mother of "parental alienation," asserting that she has "withheld" A.F. from him and told her "things about [him] that aren't true." "I love my daughter," he testified, adding that he wanted to try to "heal" their "relationship."

¶26  Consistent with her report, Ms. Anderson testified that although A.F. "does have a lot of emotional issues," those issues cannot be traced to her relationship with Father. Ms. Anderson explained that, when she interviewed "the therapists in this case," they "couldn't state" that A.F.'s emotional issues were "specific to" Father or "his parenting" of A.F. On the contrary, Ms. Anderson testified, A.F. also has "trauma triggers" unrelated to Father.

¶27  Ms. Anderson indicated that, in her opinion, A.F.'s unwillingness to spend time with Father stems from information she has been told by others. She noted, for example, that A.F. said that Father "used to be mean" to Mother even though A.F. was too young to remember Father's acts of domestic violence during her parents' marriage. Ms. Anderson also stated that A.F. speaks of Father using words that a child wouldn't "normally use," including calling him "a criminal" who "breaks

the rules and law," and was unable to explain her negative statements about Father using specific examples.

**¶28** After trial, the court issued its ruling denying Mother's petition. The court found that, "[w]hile it is likely that Father bit [A.F.] on May 5, 2019, other explanations are possible." The court noted that A.F. may not have sustained the bite injury while she was with Father and that, instead, "[t]he bite could have occurred at any point during the day." The court concluded that Mother "failed to prove, by clear and convincing evidence," the abuse allegations of her petition. The court further held that, in any event, Mother also "failed to prove, by a preponderance of the evidence, that it would be in [A.F.'s] best interest for Father's parental rights to be terminated."

**¶29** Mother timely appealed. We have jurisdiction under A.R.S. §§ 8-235(A), 12-120.21(A)(1), and 12-2101(A)(1).

## DISCUSSION

**¶30** A parent's right to custody and control of his or her child, though fundamental, is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). The parental relationship may be terminated if the juvenile court finds, by clear and convincing evidence, at least one statutory ground for termination under A.R.S. § 8-533(B) and further finds, by a preponderance of the evidence, that termination is in the child's best interests. *Timothy B. v. Dep't of Child Safety*, 252 Ariz. 470, 474, ¶ 13 (2022). We view evidence in the light most favorable to sustaining the juvenile court's findings, *see Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 207, ¶ 2 (App. 2008), and we "will affirm the juvenile court's termination order absent an abuse of discretion or unless the court's findings of fact were clearly erroneous," *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58, ¶ 9 (App. 2015) (cleaned up).

> **I.** **The Juvenile Court Did Not Abuse Its Discretion in Determining that Mother Failed to Meet Her Burden of Proving the Abuse Allegation.**

**¶31** Mother argues that the juvenile court erred "as a matter of law" by "premis[ing] its opinion on its incorrect reading of [A.R.S. § 8-533(B)(2)]." Noting that A.R.S. § 8-533(B)(2) establishes grounds for termination if a parent has "wilfully abused a child," Mother contends that the court erroneously interpreted the statute to require a showing that the abuse was "serious."

**¶32**       Mother misconstrues the juvenile court's ruling. Although the court quoted Ms. Anderson's opinion that the "biting" incident was "an isolated incident and not 'serious abuse,'" the court did not hold that Section 8-533(B)(2) requires a showing of "serious" abuse. Instead, the court found that, although "it is likely that Father bit [A.F.]," "other explanations are possible" and Mother "failed to prove" the allegation "by clear and convincing evidence." In so ruling, the court correctly recognized that the "clear and convincing" evidence standard requires a showing greater than mere likelihood. *See Kent K. v. Bobby M.*, 210 Ariz. 279, 284-85, ¶ 25 (2005) ("Clear and convincing evidence . . . reflects a heightened standard of proof that indicates that the thing to be proved is highly probable or reasonably certain.") (cleaned up); *Martin v. Reinstein*, 195 Ariz. 293, 314, ¶ 68 (App. 1999) (noting that "likely" is defined as "probable").

**¶33**       Because the juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings," *Jesus M. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002), we review deferentially the court's determination that Mother did not prove her allegation that Father bit A.F. by clear and convincing evidence. *See also Denise R. v. Ariz. Dep't of Econ. Sec.*, 221 Ariz. 92, 94, ¶ 5 (App. 2009) (appellate court's review of termination ruling "does not entail consideration of whether the evidence was, in our opinion, clear and convincing"). Here, Mother's reference to the purported "plethora of evidence" that Father bit A.F. is effectively a request that we reweigh conflicting evidence, which we will not do. *See Jennifer S. v. Dep't of Child Safety*, 240 Ariz. 282, 287, ¶ 16 (App. 2016). Because "reasonable evidence" supports the court's determination that Mother failed to meet her burden of proof under A.R.S. § 8-533(B)(2), we affirm it. *See id.*

**II.    The Juvenile Court's Determination that Termination Is Not in A.F.'s Best Interests Is Supported by Reasonable Evidence.**

**¶34**       In denying Mother's petition, the juvenile court also determined that termination of Father's parental rights is not in A.F.'s best interests. *See* A.R.S. 8-533(B). Mother argues that this determination is erroneous because "the evidence overwhelmingly showed that termination was in A.F.'s best interests."

**¶35**       "[T]ermination is in [a] child's best interests if either: (1) the child will benefit from severance; or (2) the child will be harmed if severance is denied." *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 150, ¶ 13 (2018). "Courts must consider the totality of the circumstances existing at the time of the severance determination," with the "child's interest in

stability and security" as the "primary concern." *Id.* at 150-51, ¶¶ 12-13 (citation omitted). "Whether severance is in the child's best interests is a question of fact for the juvenile court to determine." *Jesus M.*, 203 Ariz. at 282, ¶ 13.

**¶36** Mother argues that A.F. would benefit from termination because C.C., "with whom A.F. has a strong and loving relationship," is willing to adopt her.

**¶37** Although immediate availability of an adoptive placement is one of the factors a court may consider, adoptability alone does not establish that termination is in a child's best interests. *See Alma S.*, 245 Ariz. at 150-51, ¶ 13; *see also Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 14 (2016) ("Of course, a court need not automatically conclude that severance is in a child's best interests just because the child is adoptable; there may be other circumstances indicating that severance is not the best option."). Here, numerous factors support the juvenile court's determination that, despite C.C.'s desire to adopt A.F., termination is not in her best interests. Perhaps most important, *none* of the experts who testified—including Mr. Buckman, Ms. Vance, and Dr. Gallagher—opined that terminating Father's parental rights would be in A.F.'s best interests, while one of them—Ms. Anderson— expressly testified to the contrary. Indeed, Ms. Anderson opined that "with the right services in place," reunification with Father "could be a positive thing" for A.F.

**¶38** Mother faults the juvenile court for accepting Ms. Anderson's testimony, accusing the court of "impermissibly delegat[ing]" its decision-making authority by "simply adopt[ing]" Ms. Anderson's opinions instead of drawing its own conclusions.

**¶39** The juvenile court may "neither delegate a judicial decision to an expert witness nor abdicate its responsibility to exercise independent judgment" with respect to a child's best interests. *DePasquale v. Superior Court*, 181 Ariz. 333, 336 (App. 1995); *see also Christopher K. v. Markaa S.*, 233 Ariz. 297, 301, ¶ 20 (App. 2013) ("Though the court may consider an expert's opinion, . . . [t]he court itself must weigh the evidence—it cannot simply adopt [an expert's] report as establishing a presumptive result."). In *DePasquale*, the superior court ordered a psychological evaluation in a custody dispute and announced in advance that it would "adopt" the psychologist's recommendations on an interim basis pending further proceedings. 181 Ariz. at 334. This Court held that by "declaring" in advance that it "would order whatever interim custody the psychologist might recommend," the superior court improperly "delegate[d] a judicial

decision to an expert witness" and "abdicate[d] its responsibility to exercise independent judgment." *Id.* at 335-36.

¶40 Contrary to Mother's assertions, the juvenile court here did not simply defer to Ms. Anderson's recommendations without exercising independent judgment. The record demonstrates instead that the court reviewed and considered a substantial body of evidence to determine whether termination was appropriate. During the ten-day trial, the court heard testimony from over a dozen witnesses and considered numerous exhibits, including the parents' 2016 dissolution decree, Ms. Vance's treatment notes, the police report of the "biting" incident, and various photographs and videos. The court set forth its findings in a written order that demonstrates careful consideration of the evidence. The court's thorough ruling shows that it independently "weigh[ed] the evidence." *Christopher K.*, 233 Ariz. at 301, ¶ 20. The mere fact that the court's findings were consistent with Ms. Anderson's opinions does not indicate that it impermissibly delegated its decision-making authority to Ms. Anderson. *Cf. Wilson v. Wilson*, 1 CA-CV 17-0704, 2018 WL 6217172, at *3, ¶¶ 10-11 (Ariz. App. Nov. 29, 2018) (mem. decision) (rejecting claim that court improperly adopted findings set forth in prior court orders and noting that the court's "detailed changes and additions to those findings . . . demonstrate that the court . . . exercised its independent judgment after considering the facts"); *see also Knauer v. Rosales*, 2 CA-SA 2022-0017, 2022 WL 1918782, at *6, ¶ 21 (Ariz. App. June 3, 2022) (mem. decision) ("A court does not improperly delegate its authority by considering expert opinions.").

¶41 Mother asserts that the court's denial of her petition was contrary to the recommendations of the other mental health professionals. Mother notes, for example, that Mr. Buckman testified that "Father has difficulty channeling his anger in a constructive manner and can have trouble managing his impulses." Likewise, she observes, Ms. Vance and Dr. Gallagher both testified that A.F. has PTSD, and Dr. Gallagher testified that A.F. "should avoid PTSD triggers." This testimony, Mother contends, "demonstrate[s] that continued contact with Father could aggravate A.F.'s post-traumatic stress disorder." All of this evidence, Mother contends, "overwhelming[ly] showed that termination was in A.F.'s best interests," and the court's contrary determination was "not supported by the evidence."

¶42 Mother's arguments overlook other testimony from those same witnesses that supports the court's determination that termination would not be in A.F.'s best interests. Mr. Buckman, for example, testified

that termination can "create a hole" in a child's life and that a parent's failure to support the child's relationship with the other parent can cause emotional damage. Similarly, Ms. Vance opined that termination is rarely in a child's best interests and would be appropriate only "[i]f a child could never feel safe and secure" with the parent. She further testified that the relationship between Father and A.F. was not beyond repair, explaining that if Father "could actually hear her and listen to her," A.F. would "be able to overcome" her fear of Father.

¶43        Dr. Gallagher testified that she is "not sure exactly what . . . caused" A.F.'s PTSD and could not trace it to Father. She further noted that A.F. can be "trigger[ed]" by "other things" besides Father and that her most recent "regression" began in March 2022, almost three years after her last contact with him. Nothing in Dr. Gallagher's testimony supports a finding that termination of Father's rights would ameliorate A.F.'s PTSD.

¶44        Mother also overlooks the testimony of counselor Danna Peterson, who explained that one parent's open or covert hostility to the other parent can create "a loyalty bind" in the child and that "[a] child who is in a loyalty bind can exhibit behaviors such as anxiety" that "mimic abuse and trauma." In apparent reference to C.C.'s testimony that he built a backyard fire to burn Father's gifts to A.F., Ms. Peterson testified that "burning gifts" from a parent could "reinforce[] a loyalty bind." Ms. Peterson described various indicators of loyalty binds, including throwing a "tantrum" during parenting time exchanges and expressing unwillingness to spend time with a parent without being able to explain why. The juvenile court expressly noted that when it met with A.F. in chambers with counsel present, A.F. made statements consistent with Ms. Peterson's description of loyalty binds; for example, A.F. "indicated" that "she did not want to see [F]ather . . . because [he] was a 'monster' and a 'criminal,'" but she "could provide no specifics" to explain her statements.

¶45        At bottom, Mother's claim that the expert testimony favored termination amounts to an impermissible invitation to re-weigh the evidence. *See Jennifer S.*, 240 Ariz. at 287, ¶ 16. Thus, her arguments are unavailing.

¶46        Mother argues that denying termination would harm A.F. because Father suffers from poor impulse control and he has failed to show that he has learned to "control[] his volatile temper." But the juvenile court properly considered evidence of Father's efforts to address his anger issues and repair his relationship with his daughter. *See also Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 8 (1990) (evidence of parent's "intentions

towards the child . . . may properly be used in weighing whether the child's best interests would be served by termination"). Among other things, the court found that despite "firmly" believing he is the "victim of parental alienation," Father has "nevertheless" actively engaged in numerous services designed to make him a better parent, including individual counseling and parenting classes.[2] *See also Alma S.*, 245 Ariz. at 151, ¶ 15 ("[A]lthough the focus of the best-interests inquiry is on the child, courts should consider a parent's rehabilitation efforts as part of the best-interests analysis."). The court further found that, despite having no contact with A.F. since May 2019, Father has consistently made sincere efforts to maintain a relationship with her within the bounds of the 2019 Order. He has "continued to send cards and gifts" to A.F. and, after two of the envelopes containing gift cards were returned, set up a bank account for A.F. "so that [she] can get the money when she's 18." Given all of this evidence, we cannot say that the juvenile court abused its discretion by finding that, in light of the "significant changes" Father has made "since he last saw" A.F., "[t]here is still time for Father and [A.F.] to repair their fractured relationship" and therefore that termination of Father's parental rights would not be in A.F.'s best interests. That alone requires us to affirm the juvenile court's denial of Mother's petition. *JS-500274*, 167 Ariz. at 5 ("[T]he best interests of the child could be a sufficient reason for a denial of termination.").

## CONCLUSION

¶47        Because ample evidence supports the juvenile court's determination that Mother failed to establish grounds for termination under A.R.S. § 8-533(B)(2) by clear and convincing evidence and that termination would not be in A.F.'s best interests, we affirm.

¶48        Father requests attorney fees and costs pursuant to A.R.S. § 25-324 and ARCAP 21. By its terms, A.R.S. § 25-324 applies only to proceedings under chapters three and four of Title 25 of the Arizona Revised Statutes, and so does not apply here. ARCAP 21 does not create a

---

[2] Mother spends much of her reply brief refuting Father's allegations of "parental alienation." But the juvenile court made no finding of parental alienation. Instead, in determining A.F.'s best interests, the court properly considered Father's willingness to put his own feelings toward Mother aside and focus on becoming a better parent. *See Timothy B.*, 252 Ariz. at 478, ¶ 31 (noting that a "parent's interest in maintaining a positive parent-child relationship and the parent's efforts . . . to do so" are factors to consider in determining child's best interests).

substantive right to fees and costs and, in any event, does not apply in juvenile proceedings. *See* ARCAP 21(a)(2); *see also* Ariz. R.P. Juv. Ct. 103(d), 602(i) (listing rules of civil appellate procedure that apply in juvenile proceedings). Accordingly, Father's request for fees and costs is denied.



AMY M. WOOD • Clerk of the Court
FILED: AA